JAN 15 2020
FILED-USDC-CT-HARTFORD

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

STATE OF CONNECTICUT          :
                              :     January 15, 2020       3:20mj27 LAR
                              :
COUNTY OF HARTFORD            :     **FILED UNDER SEAL**


## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Russell H. Frandsen, being first duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation, and have been since December 2017. I am currently assigned to investigate white collar crimes at the FBI's New Haven Division. In my capacity as a Special Agent, I have investigated allegations of wire and mail fraud, embezzlement, bid rigging, and public corruption. I have also participated in the execution of warrants involving the search and seizure of computers, computer equipment, software, and electronically stored information. I have received training through the FBI Academy in Quantico, Virginia, and through my legal education at an ABA-accredited law school. Before joining the FBI, I was a licensed attorney in private practice, where I specialized in commercial litigation.

2. I submit this affidavit in support of a criminal complaint and arrest warrant for **Justin Williams**, for violations of Title 18, United States Code, Section 1343. Based on the facts set forth below in this affidavit, there is probable cause to believe, and I do believe, that **Williams** has violated the above-referenced criminal statute.

3.  The information contained in this affidavit is based on the investigation to date, which includes, but is not limited to, subpoenaed grand jury records, interviews with victims and others, my personal knowledge and involvement in the investigation, official government records checks and public records checks, my training and experience as a criminal investigator, and my conversations with other law enforcement officers and investigators. Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested criminal complaint and arrest warrant, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause to support the requested criminal complaint and arrest warrant.

## BACKGROUND ON JUSTIN WILLIAMS

4.  **Williams** is a U.S. citizen who currently resides in Rocky Hill, Connecticut.

5.  From approximately February 2004 through November 2007, **Williams** was employed as a loan processor by Connecticut Partners Mortgage ("CPM"), a then-licensed mortgage brokerage located in Hartford and owned and operated by George Hajati. **Williams**, Hajati, and others originated fraudulent mortgage loans through CPM by knowingly submitting falsified income, assets, and employment information of borrowers to multiple lenders.

6.  In November 2007, the government executed a search warrant of the offices of CPM. In January 2008, **Williams** left the United States to avoid prosecution for the mortgage fraud activity under investigation. **Williams** and Hajati went to Albania, then to Australia, and then back to Albania.

7.   In February 2009, **Williams** and Hajati were indicted in absentia on charges of conspiracy to commit wire fraud and wire fraud relating to a mortgage fraud conspiracy. Williams returned to the United States and was arrested in or around March 2009.

8.   **Williams** pled guilty to four counts in the indictment in October 2009. On August 4, 2015, he was sentenced by Judge Alvin W. Thompson to time served, three years of supervised release, 150 hours of community service, and a fine of $5,400.[1]

### BACKGROUND ON CAR NATION, LLC AND MIDDLETOWN MOTORCARS LLC

9.   Over the past twenty years, 1075 Newfield Street, Middletown, Connecticut has been the location of used car dealerships operating under several limited liability companies, including Auto Store LLC, Car Nation, LLC, Car Nation CT, LLC, and, currently, Middletown Motorcars, LLC. According to records of the Connecticut Secretary of State, since approximately 2017, these LLCs have been owned and operated by members of Hajati's family.

10.   **Williams** worked at Car Nation as a salesman from approximately August 2015 through September 2016. During at least part of the time that Hajati was incarcerated for the mortgage fraud case, **Williams** was also General Manager of Car Nation. At all times of the crime under investigation, **Williams** was on federal supervised release.

11.   Hajati was incarcerated on October 1, 2015, released to a halfway house on

---

[1] Hajati was eventually extradited to the United States and in August 2015 was sentenced by Judge Thompson to a year and a day in prison.

3

April 8, 2016, placed on home confinement on July 5, 2016, and released on August 8, 2016. Hajati was arrested in this investigation on July 2, 2019 and charged with violating Title 18, United States Code, Section 1343 (wire fraud). The automobile dealership has been closed since that date.[2]

## INVESTIGATION TO DATE

12.     The FBI has been investigating an auto loan fraud scheme involving **Williams** and Hajati regarding allegations that **Williams** and Hajati submitted materially false auto loan applications and information to auto lenders to obtain loans. The false statements included fictitious jobs and incomes, forged signatures, fabricated documents (including pay stubs and Social Security benefit statements), and false expenses. As discussed below, several auto loans obtained through fraud went into default and, in some cases, the lender repossessed the vehicle.

### Borrower #1

13.     In January 2016, Borrower #1 found a 2009 Honda Civic offered for sale online by Car Nation. Borrower #1 and two of his uncles went to Car Nation, where they met with two salespersons, one female and one male. Borrower #1 later identified the male salesperson as **Williams**.

---

[2] On December 20, 2019, Hajati pled guilty to a one-count Information charging wire fraud in 3:19CR317 (RNC) and admitted to a supervised release violation in 3:09CR35 (AWT). He awaits sentencing in both cases.

4

14. Borrower #1 told **Williams** and the female salesperson that the car would be his, but that he was not working and wanted to put it in his uncle's name. All agreed that they would put the car in the name of the uncle with the best credit score. **Williams** completed the paperwork and obtained a loan from Lender #1, a lender based in New Haven, Connecticut. Lender #1 obtained the loan application electronically through Dealertrack Technologies, Inc., an online software platform located in New York.

15. Borrower #1 made monthly payments with the help of his aunt and drove the Honda for about two years, then totaled it in an accident. Because he was not the registered owner, his insurer would not cover the loss.

16. Borrower #1 reviewed multiple documents associated with the purchase of the Honda and stated that they contained false information. For example, the purchase order falsely stated that his down payment was $2,500, rather than the true figure of $2,000.

17. The loan application and associated documents also contained false statements regarding the applicant's income. Borrower #1 and both of his uncles had worked at a family-owned convenience store in Hartford. The loan application contained a purported employee earnings statement from the store for the uncle in whose name the Honda had been purchased. Borrower #1 reviewed the earnings statement and reported that they did not receive such statements; they were only paid by check. Moreover, the statement itself indicated that the uncle was paid approximately $4,000 a month, but, in fact, the uncle was paid much less. In addition, the loan application falsely stated that the uncle's salary at the store was $4,000 per month.

Borrower #1 laughed and stated that nobody at the store was paid that much. Connecticut Department of Labor records indicate that the uncle was paid between $1,000 and $2,000 monthly.

18. In support of the loan application for Borrower #1's uncle, a purported cell phone bill from AT&T was submitted. Borrower #1 stated that both he and his uncle had T-Mobile cell phones, not AT&T.

19. According to Borrower #1, neither he nor his uncles knew that false documents were submitted in connection with the loan application.

20. Between November 2015 and July 2016, Lender #1 approved forty loans to Car Nation customers. Twenty-two of those loans are in default or about to go into default. The office manager for Lender #1 stated that credit history, income and earnings statements, and loan to value ratios are all material factors in their decision to approve a loan.

### Borrower #2

21. In January 2016, Borrower #2 was interested in buying a used car, but had no job and was collecting unemployment compensation while attending community college. A friend advised her that she had obtained a car loan for a BMW at Car Nation even though she too was unemployed. Borrower #2 went to Car Nation and met with two employees, a salesman and a manager. She later identified the manager as **Williams**.

22. Borrower #2 told **Williams** that she was unemployed and could not find a co-signer, but that she was expecting a large tax refund. **Williams** instructed her to return to Car Nation after receiving the refund.

23. Borrower #2 received a tax refund by debit card in February 2016. She returned to Car Nation, where **Williams** told her that he could accept cash, but not the debit card. Borrower #2 cashed the debit card and gave $8,000 cash to **Williams** as a down payment on a Mazda. **Williams** completed the loan paperwork and obtained a loan from Lender #1 for about $9,000. Lender #1 obtained the loan application electronically through Dealertrack Technologies, Inc., an online software platform located in New York.

24. Borrower #2 drove the Mazda for about four months until her boyfriend totaled it in an accident. Her insurer would not cover the loss because she was not the driver, and Lender #1 made a claim against her for about $8,000.

25. Borrower #2 reviewed multiple documents associated with the purchase of the Mazda and stated that they contained false information. For example, the purchase order stated that the down payment was $7,000, rather than the true figure of $8,000. Shown the loan application, Borrower #2 initially thought that her three signatures on the document were legitimate; having reviewed them closely, however, she now believes that they were forged.

26. The loan application also falsely stated that Borrower #2 was employed by a company called VIP Solutions and made $3,500 per month. Borrower #2 has never heard of that company and had never made $3,500 per month at any job. Finally, several documents

submitted with the loan application were false: two purported earnings statements from VIP Solutions that Borrower #2 had never seen, and a utility bill in her name from an account she never held.

27.  Borrower #2 stated that **Williams** did not tell her he was submitting false documents in connection with her loan application and that, had he told her, she would not have purchased the car.

## Other Borrowers and Lenders

28.  **Williams**'s scheme was not limited to Borrowers #1 and #2 and Lender #1. Rather, the scheme included the submission of materially false documents in connection with loans for additional borrowers that were made by lenders other than Lender #1 between January 2016 and June 2016.

29.  The false statements made in connection with other loans took multiple forms. For example, some loan applications falsely stated that the borrower was employed by a company for which he or she had never worked. Other applications contained fabricated Social Security benefits statements representing that the borrower was receiving benefits as income when, in fact, the applicant had never received Social Security benefits. Still other applications accurately identified a source of the borrower's income, but inflated its amount.

30.  Lenders who issued these loans have experienced multiple defaults on loans originating from Car Nation. These lenders regard information about an applicant's employment and income as material in deciding whether to make a loan.

## CONCLUSION

31.     Based on the information contained in this affidavit, I believe there is probable cause that **Justin Williams** has violated Title 18, United States Code, Section 1343 (wire fraud). Accordingly, I respectfully request that the Court issue a warrant for the arrest of **Williams**.

*[signature]*
SPECIAL AGENT RUSSELL H. FRANDSEN
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn to before me this 15th day of January, 2020, in Hartford, Connecticut.

/s/ Robert A. Richardson
HONORABLE ROBERT A. RICHARDSON
UNITED STATES MAGISTRATE JUDGE